UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re

                                                    Case No. 05-86636-reg

MARINE RISKS, INC.,                            Chapter 7
Debtor.
------------------------------------------------------------X
NEIL H. ACKERMAN, CH. 7 BANKR. TRUSTEE
OF MARINE RISKS, INC.,                      Adv. Proc. No. 06-08419-reg
Plaintiff,
v.
WALTER PILIPIAK,
Defendant.
------------------------------------------------------------X

### *MEMORANDUM DECISION*

       This matter is before the Court pursuant to a third-party complaint commenced by the

Debtor pre-petition, which was subsequently removed  to the Bankruptcy Court.  Neil H.

Ackerman, Esq. ("Trustee"), the Chapter 7 trustee in the matter of Marine Risks, Inc. ("Debtor")

has been substituted as the plaintiff in place of the Debtor, and Walter Pilipiak ("Defendant") is

the defendant. The first cause of action in the complaint  asserts that the Defendant breached his

fiduciary duties as an officer and a director of the Debtor by soliciting the Debtor's clients for his

own benefit while he was employed by the Debtor.  In the second cause of action, the Trustee

asserts that the Debtor breached his fiduciary duties as an officer and director of the Debtor by

appropriating for his own benefit a business opportunity belonging to the Debtor while he was

employed by the Debtor.  In the third cause of action, the Trustee alleges that the Defendant

tortiously interfered with a proposed transaction between the Debtor and a third party.

       The Trustee has concluded his case in chief and requests that the first two causes of

action in the complaint be amended to conform to the evidence presented at trial pursuant to Fed.

R. Civ. P. 15(b). The Trustee seeks to amend the first and second causes of action to include the Defendant's conduct after he resigned from the Debtor, and to add to the second cause of action that the Defendant misappropriated key employees of the Debtor. The Trustee also seeks to add to the second cause of action a claim that the Defendant breached his fiduciary duties as an officer and director of the Debtor by misappropriating a second business opportunity of the Debtor's for his own benefit. The Defendant opposes the Trustee's request and moves for judgment in favor of the Defendant dismissing all three counts of the complaint pursuant to Fed. R. Civ. P. 52(c) and Fed. R. Bankr. Proc. Rule 7052 ("Motion"). For the reasons set forth below, (1) the Trustee's request to amend the complaint is granted except as to the allegation that the Defendant breached his fiduciary duties to the Debtor after he resigned, and (2) the Motion is granted as to all causes of action as amended. The Plaintiff has failed to establish a *prima facie* case under any of the three causes of action. As to the first two causes of action, the Trustee failed to meet his burden of proof that the Defendant breached his fiduciary duties as an officer and director of the Debtor, and that the Defendant's conduct caused injury to the Debtor, resulting in quantifiable damages. The Plaintiff has also failed to establish a *prima facie* case for tortious interference with a proposed transaction between the Debtor and a third party because there was no binding agreement that the Defendant could interfere with, and there is no evidence that the Defendant's conduct caused the third party to breach any contract. In addition, there is no evidence of damage to the Debtor flowing from the Defendant's conduct.

### *Procedural History*

On November 6, 2000, the Debtor filed the complaint as a third-party action against the Defendant in New York State Supreme Court, New York County. The third-party action was

commenced in response to a complaint filed by the Defendant and Robert Ludemann representing the shareholders of the Debtor, against Bruce Keyes, the Debtor and other directors of the Debtor.  The complaint alleged that Bruce Keyes and the other individual defendants engaged in a course of conduct in violation of their fiduciary duties to the Debtor.  The third-party action was removed to the United States District Court for the Southern District of New York on January 4, 2001 (the "SDNY Lawsuit").  The allegations contained in the SDNY Lawsuit describe a course of conduct by the Defendant whereby he intended to and in fact did interfere with and prevent a proposed transaction between the Debtor and a competitor, Nausch, Hogan and Murray ("NHM").  As set forth in greater detail below, the beneficiaries of the NHM transaction would have been solely the shareholders of the Debtor.  Under the transaction the shareholders would have received a stream of payments based on a percentage of income generated by the former clients of the Debtor over five years.  In the SDNY Lawsuit, the Debtor asserted the following three causes of action against the Defendant: 1) prior to his resignation as an officer and director of the Debtor, Defendant "actively solicited clients of [the Debtor], and diverted those clients and their business away from [the Debtor] for his own purposes" in breach of his fiduciary duties to the Debtor;  2) the Defendant breached his duties as an officer and director of the Debtor when he "utilized his position and information acquired while in a fiduciary role as an officer and director of [the Debtor], to appropriate the business opportunity afforded by [the NHM transaction] for his own benefit, by diverting the business and clients encompassed by [the NHM transaction] to his own use while continuing to serve as a member of the Board of Directors of [the Debtor];"  and 3) the Defendant tortiously interfered with the agreement between the Debtor and NHM, resulting in NHM's withdrawal of its proposed NHM

transaction.[1]  For each count, the plaintiff sought damages of at least $1 million, a figure based on the aggregate amount of revenues the shareholders would have received from NHM over the five year period had the NHM transaction taken place.  On January 8, 2001, the Defendant filed an answer to the complaint and asserted, *inter alia,* following affirmative defenses: 1) failure to state a claim, 2) a defense is founded upon documentary evidence, 3) any loss or damage resulted from the breach of duty or fault of the Debtor and/or others for whom the Defendant is not responsible, 4) the Debtor is not the real party in interest, failure to mitigate damages, the complaint is interposed in bad faith and is barred by the equitable doctrine of unclean hands.  Thereafter, in late 2005, the SDNY Lawsuit was marked off the District Court's calendar for lack of prosecution.

On September 22, 2005, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code, and thereafter the Trustee was appointed as acting trustee in the Debtor's bankruptcy case.  By stipulation between the parties so-ordered by the District Court on September 18, 2006, the SDNY Lawsuit was reopened and transferred to the Bankruptcy Court, without any amendment to the claims originally asserted by the Debtor.  February 1, 2006, was fixed as the last date to file claims in this case. According to the claims register, there are $153,742.92 in unsecured claims, and one secured claim in the amount of $250,000.  The law firm currently representing the Defendant filed the secured claim based on an alleged charging lien against the Debtor.  The Trustee's administration claims have not been calculated to date, but the Trustee's professionals have spent considerable time on this case.  Based on the time spent by the Trustee's professional litigating this adversary proceeding to date, these

---

[1]A fourth cause of action was dismissed by order entered on January 10, 2003.

professionals will be seeking compensation from this estate in amounts which will be significant in relation to the dollar amount of claims filed in this case.

On February 23, 2009, the parties filed a Joint Pretrial Memorandum outlining the parties' summaries of the case and the facts and issues of law in dispute.  Included in the Joint Pretrial Memorandum is the Trustee's contention that "[a]s a result of [the Defendant's] breach of fiduciary duty in diverting the clients and key employees of the Debtor for his own benefit, appropriation of the business opportunity of the Debtor presented by [Cosmos Services America, Inc. ("Cosmos"), another insurance broker], and the tortuous (sic) interference with the NHM Sales Agreement, the Debtor became unsalvageable and its demise imminent."  The Joint Pretrial Memorandum also includes the Trustee's recitation of  issues of law to be determined, including, "[w]hether [the Defendant] breached his fiduciary duty as an officer, director and employee of the Debtor by misappropriating the business opportunity presented by Cosmos?"

The trial took place on February 26, 2009, April 21, 2009, August 4 - 6, 2009,  October 13 - 15, 2009, October 23, 2009, October 28, 2009, November 17, 2009 and January 5, 2010. On January 25, 2010, the Defendant filed the Motion.  On February 24, 2010, the Trustee filed opposition to the Motion, and included his request to amend the complaint to conform to the evidence presented at trial.  On April 17, 2010, the Defendant filed a response to the Trustee's opposition in which the Defendant objected to the Trustee's request to amend the complaint. Thereafter, the Motion was marked submitted.

### Facts

The Debtor was a New York corporation engaged in the business of brokering marine, automobile and other types of insurance.  Bruce Keyes is the majority shareholder of the Debtor,

holding fifty-nine (59) shares of common stock, representing 62.8% of the common shares issued, and ten (10) shares of preferred stock, representing 33.33% of the preferred shares issued. The Defendant holds fifteen (15) shares of common stock in the Debtor, representing 16% of the common shares issued, and ten (10) shares of preferred stock, representing 33.33% of the preferred shares issued. The Defendant was an Officer and Director of the Debtor until his resignation on December 21, 1998. Frank Marcigliano was a Director of the Debtor during the relevant time period and is an attorney licensed to practice law in the State of New York. During the time period relevant to this proceeding, Keyes was the President and a Director of the Debtor. Robert Ludemann is also a shareholder of the Debtor owning approximately 5% of the common shares of the Debtor and 16% of the preferred shares of the Debtor. Kevin Mullady was an employee and an officer of the Debtor and he held approximately 5% of the Debtor's common stock and 16% of the Debtor's preferred stock.

The Debtor was in the insurance brokerage business. The Debtor's business involved assisting clients in analyzing their specific insurance needs, then obtaining the appropriate policies for the clients. The Debtor's income was derived from commissions earned for procuring the insurance for its clients. (2/26/09 Tr. p. 53) The Debtor was also in the reinsurance business, which assisted insurance companies in spreading their insurance risks. Most of the policies procured by the Debtor for its clients provided coverage for one year, at which time the client was free to renew the policy or terminate the policy. (2/26/09 Tr. p. 54) Towards the end of each coverage year, the Debtor would present the client with a proposal based on the Debtor's analysis of the client's insurance needs for the coming year. Once the client agreed to purchase insurance using the Debtor as its broker, the client would issue a

"broker of record" letter stating that the Debtor was the client's agent for all purposes except the collection of premiums. Commissions on policies were earned by the Debtor as broker as of the date the business was first placed, and remained property of the Debtor as the original broker. (2/26/09 Tr. p. 62) With respect to marine insurance, the Debtor customarily billed the client for the premium after the client signed the insurance binder, and remitted the premium, minus the commission earned by the Debtor, to the insurance company actually providing the insurance. To the extent the client was billed on a monthly basis, as was the case for marine open cargo contracts, the Debtor would collect the monthly premiums and deduct its commission, forwarding the remainder to the appropriate insurance company.

The Defendant was hired by the Debtor in 1987 as a Vice President in the Debtor's marine insurance department. Initially the Defendant was responsible for soliciting new clients, negotiating insurance contracts, procuring insurance for clients, and resolving claims filed by clients. (10/13/09 Tr. p. 85) Kevin Mullady, who worked with the Defendant at his prior employer, also joined the Debtor shortly thereafter. The Defendant was ultimately named a director of the Debtor and was promoted to the position of Executive Vice President. (10/13/09 Tr. p. 105) In 1994, Marcigliano became a Director of the Debtor, joining Keyes and the Defendant.

In the Summer of 1997, after the Defendant's responsibilities had been increased to include oversight of the Debtor's general operations, the Defendant discovered that the Debtor was retaining return premium checks which belonged to the Debtor's clients. When the Defendant questioned Keyes about this practice, Keyes directed that false memo bills be drawn up to correspond to the deposits in question. Thereafter, the Defendant undertook, on his own,

an internal investigation of the Debtor's prior and current billing processes.  Upon completion of the Defendant's investigation in December 1997, he concluded that the Debtor had been systematically improperly collecting and retaining funds which belonged to clients of the Debtor. In addition to discovering these improper diversions of funds, the Defendant determined that the Debtor's financial statements were materially false.  (10/15/09 Tr. p. 98)  The Defendant admits that he did not share the results of his investigation with either Keyes or Marcigliano, the two other Directors of the Debtor.

In late 1997, after a consultant had been retained to review the Debtor's operations and make recommendations to improve the Debtor's business, the Debtor underwent an internal restructuring, resulting in significant changes in the Defendant's responsibilities.  On December 23, 1997, the Debtor issued an inter-office memorandum summarizing the proposed restructuring ("Restructuring Memo").  (Plaintiff's Ex. 118)  According to the Restructuring Memo, as of early January, 1988 the Defendant would be responsible for sales, marketing and new business development, and would be coordinating with the branch managers for the Debtor's Midwest and West Coast offices.  In addition, the Defendant would work directly with the general managers of the Debtor in charge of marine and non-marine business, while continuing to have senior account executive responsibilities for the following six clients of the Debtor: Evergreen America Corporation, Eva Air, Yamato Transport, Rico Corporation, Atlantic Container Line, and co-account executive responsibilities for Matheson Gas Products. (Plaintiff's Ex. 118) Significantly, the Debtor's accounting department would no longer report to the Defendant, and the Defendant would not be responsible for supervising the Debtor's employees.  As a result of the restructuring, according to the Defendant's testimony, the Defendant's time would now be

spent on sales and marketing.  (10/15/09 Tr. p. 107, 111)  The Defendant objected to his decreased role in operations and voiced these objections to Keyes, but the Defendant's new role remained unchanged.  (10/15/09 Tr. p. 121)

In January and February 1998, the Defendant was interviewed by the New York State Department of Insurance to discuss his investigation of the Debtor's accounting irregularities. (10/15/09 Tr. p. 58, 164)  In the Spring of 1998, the Defendant met with the New York County District Attorney's office to discuss these findings.  (10/15/09 Tr. p. 165)

During the second half of 1998, the Debtor's account managers were in the process of ensuring that the Debtor's clients renewed their broker of record contracts with the Debtor which were set to expire at the end of the year.  This process involved gathering information from the current clients, meeting with the clients to determine the best insurance products for each client, organizing information received from each client, and suggesting insurance products to each client.  (8/4/09 Tr. p. 42)  Once the client agreed in principal to the next year's coverage, the account manager would notify the insurance company of the policy being renewed and its terms, and an insurance binder would be prepared.  (8/4/09 Tr. p. 42)

As of November 1, 1998, the Debtor had approximately 100 clients.  Keyes testified that the Debtor's gross revenues for 1998 were approximately $2.4 to $2.5 million.  Nippon Express was the Debtor's largest client, and represented between 30% and 40% of the Debtor's revenue. (8/4/09 Tr. p. 41, 10/28/09 Tr. p. 157)  Approximately 60% to 70% of the Debtor's clients were Japanese-owned  businesses.  (8/4/09 Tr. p. 47)  The Debtor had approximately twenty four employees at this time.  Approximately 70% of the Debtor's Japanese accounts were scheduled for renewal at the end of 1998.  (8/4/09 Tr. p 47)

On or before November 10, 1998, Keyes learned that the District Attorney for New York County, had obtained a criminal indictment naming him.  On November 11, 1998, Keyes asked the Defendant to sign a copy of the minutes of a special meeting of the Debtor's Board of Directors dated November 10, 1998, which, *inter alia*, provided that the "full resources of the [Debtor]" would be employed to defend any action brought against the Debtor or Keyes, including any criminal action against Keyes.  (Defendant's Ex. G)  The Defendant refused to sign the minutes as he was not present at this meeting, and he did not consent to the use of the Debtor's funds to pay the costs of defending Keyes in a criminal action against him personally.

On November 12, 1998, Keyes was arrested and charged with nineteen counts of fraud and grand larceny.  On the evening of November 12, 1998, Keyes convened a telephone conference call with the Defendant and the other key employees of the Debtor to discuss his strategy to retain the Debtor's clients in light of his indictment.  The Defendant testified that after Keyes was indicted, the Debtor could only continue as a viable business if Keyes "stepped down" from his involvement with the Debtor.  (10/28/09 Tr. p. 50)  Immediately after Keyes' indictment became public knowledge, clients and other parties began contacting the Debtor with questions concerning the indictment.  One of the people who contacted the Defendant was Mr. Hiroyuki Nonomura, an officer of Cosmos, who discussed with the Defendant possible employment opportunities, which the Defendant declined.  (10/28/09 Tr. p. 9, 98)  The Defendant testified that Mr. Nonomura asked whether Keyes was considering selling the Debtor, to which the Defendant responded that Nonomura would have to ask Keyes.  (10/28/09 Tr. p. 98)

On November 16, 1998, Keyes met with the Defendant and other members of the Debtor's management, during which Keyes stated he would be meeting with certain clients to "handle damage control." (10/28/09 Tr. p. 76) On November 25, 1998 the Debtor's management team, including the Defendant, met and discussed the indictment and jointly requested in writing that Keyes take a leave of absence from his duties at the Debtor until the indictment was resolved. (10/28/09 Tr. p. 90-93) Keyes declined to step down.

Keyes received word from the Debtor's largest client, Nippon Express, that it would not support Keyes after his indictment. (8/4/09 Tr. p. 28) According to Keyes' testimony, it was becoming clear to him that as a result of his indictment, the retention of "many" of the Debtor's major clients was "in jeopardy." (8/4/09 Tr. P. 27, 28) Upon further questioning at trial, Keyes admitted that unless the Debtor entered into a transaction with a "white knight," many of the clients would have eventually left the Debtor. (8/5/09 Tr. p. 85, 86)

On the evening of December 2, 1998, Keyes convened a meeting of the Debtor's management and revealed that he had met with NHM concerning a potential transaction between the Debtor and NHM. (10/28/09 Tr. p. 102-103, 4/21/09 Tr. p. 78) Keyes advised that he had agreed to the terms of a letter of intent between the Debtor and NHM ("Letter of Intent"), subject to completion of due diligence by NHM. (10/28/09 Tr. p. 115) Pursuant to the terms of the Letter of Intent, which was executed on December 9, 1998, NHM confirmed its agreement effective January 1, 1999 to acquire all of the ongoing business interests of the Debtor with respect to its insurance brokerage, reinsurance brokerage and/or consulting services. (Plaintiff's Ex. 67) As of January 1, 1999, NHM would provide services to the clients transferred by the Debtor. The Letter of Intent provided that NHM would pay to the Debtor's shareholders 20% of

the commissions generated by these clients each year for the following five years.  The Debtor

would receive nothing from NHM in exchange for the transfer of its assets.  Under the structure

of the transaction, Keyes would reap the greatest benefit as the largest shareholder of the Debtor,

and the other shareholders of the Debtor, including the Defendant, would also benefit from the

transaction.  Keyes acknowledged in his testimony that only the shareholders of the Debtor

would benefit from the transfer. (4/21/09 Tr. p. 85-86), but the Debtor itself would receive no

monetary benefit.

        According to Keyes, the business being transferred to NHM transaction generated to the

Debtor approximately $1 million in annual revenues.  (4/21/09 Tr. p. 85)   The Debtor

designated approximately twenty-eight clients Keyes believed he could have secured the

renewals for ultimate transfer to NHM.  (8/4/09 Tr. p. 106)   According to Keyes' testimony, this

business comprised approximately 40% of the Debtor's total business.  (8/4/09 Tr. P. 82) Nippon

Express was not included in the business the Debtor agreed to transfer to NHM.

        The Letter of Intent further provides that NHM would make an offer of

employment "to all key employees and branch office personnel currently employed by the

[Debtor]" and would be conducting due diligence investigations of the business and staff

interviews commencing the week of December 7, 1998. (Plaintiff's Ex. 67)  The Letter of Intent

also provides that "within a reasonable time after the due diligence investigation is completed by

[NHM, NHM] shall inform [the Debtor], in writing, whether or not, in the sole opinion of

[NHM], there is adequate merit to purchase the assets of [the Debtor]."  (Plaintiff's Ex. 67)

Keyes signed the Letter of Intent on behalf of the Debtor, and added after his signature "subject

to shareholders approval."  (Plaintiff's Ex. 67)  According to the testimony of the Debtor's

Director and in house counsel, Frank Marcigliano, the Debtor was not insolvent at the time that the Letter of Intent was executed.  (1/5/2010 Tr. p. 56, 59)

Keyes did not consider the Letter of Intent to be a "firm" contract, and it was subject to a formal written agreement by the parties, completion of due diligence by NHM and ultimate approval by the shareholders of the Debtor.  (8/5/09 Tr. p. 112-113)  Likewise, Marcigliano testified that the Letter of Intent did not constitute a binding agreement between the Debtor and NHM for the transfer of the Debtor's assets.  (1/5/10 Tr. p. 49)

At the December 2, 1998 meeting, Keyes stated that Bill Murray, one of the founding members of NHM, would determine which employees NHM would hire as of January 1, 1999. (10/28/09 Tr. p. 105)  The Defendant interpreted this statement as a de facto dismissal of all employees of the Debtor, effective as of December 31, 1998.  Despite this belief, the Defendant continued to report to work and to draw a salary from the Debtor after December 2, 1998. (10/28/09 Tr. p. 105)

After hearing the details of the NHM transaction on December 2, 1998, the Defendant told Keyes he would be willing to purchase the same assets that NHM was proposing to purchase under the same terms, which offer was rejected by Keyes and was never presented to the Debtor's Board of Directors to consider.  (4/21/09 Tr. p. 88)  According to Keyes, the Defendant was unqualified to take over the responsibilities of running the Debtor, and in fact the Defendant had recently been relieved of his responsibilities as chief operating officer of the Debtor. (4/21/09 Tr. p. 88)  The Defendant also advised Keyes about the phone call he received from Cosmos on November 12, 1998 and Cosmos' expressed interest in entering into some type of transaction with the Debtor.  (10/28/09 Tr. p. 116, 1/5/2010 Tr. p. 65)  Keyes replied that he was

not interested in pursuing any opportunity with Cosmos because the Debtor's largest client at the time, Nippon Express, was not in favor of a merger with Cosmos.  Marcigliano testified that he recalled the Defendant mentioning Cosmos to Keyes at or around the time of the December 2, 1998 meeting, but he did not believe that an acquisition of the Debtor by Cosmos would be a "reasonable possibility."  (10/23/09 Tr. p. 115 - 117)

On December 3, 1998, the Debtor issued a press release disclosing the potential NHM transaction for the purposes of advising the Debtor's clients that the Debtor intended to transfer clients and key employees to NHM.  (Plaintiff's Ex. 9, 8/5/09 Tr. p. 92)  The press release also contained the disclosure that Keyes would no longer be involved with the ongoing business of the Debtor as of January 1, 1999.

On December 3, 1998 through December 21, 1998, the Defendant continued to meet with the Debtor's clients and to seek renewals of the insurance contracts which were set to expire at the and of the year.  (Plaintiff's Ex. 87)  Although no former clients of the Debtor were called to testify at trial, the record includes one e-mail from Howard Heslin of ACL, a client of the Debtor, to another employee of ACL, dated December 7, 1998, indicating that the Defendant provided ACL with a proposed renewal contract on behalf of the Debtor, and that the Defendant advised ACL that he would decide shortly whether he would be leaving the Debtor's employment.  The e-mail further states that the reason for "this [the Defendant's impending decision] is that Bruce Keyes has announced the sale of [the Debtor] to [NHM] selling Walter down the river.  Policies are in Walter's control as the Broker of Record.  I have a scheduled appointment here with a broker from Marsh-Sedgwick, on Wednesday: 12/9."  (Plaintiff's Ex. 87)

On December 3, 1998, the Defendant contacted Cosmos regarding his possible employment.  (10/28/09 Tr. p. 110)  Mr. Nonomura, then the Senior Vice President and Treasurer of Cosmos, returned his call that day or the next day, and by letter dated December 6, 1998, the Defendant related to Cosmos that he "wished to make the following offer for Cosmos to consider."  (Plaintiff's Ex. 10)  First, he would accept the offer by Mr. Nonomura for employment by Cosmos as President and a Director.  (Plaintiff's Ex. 10)  The Defendant further outlined that he would bring six key employees to Cosmos as well as "a block of Marine and non Marine business estimated to generate revenues between $400,000 and $800,000 after a 24 month period."  (Plaintiff's Ex. 10)  No specific clients of the Debtor were named in the letter except for Nittsu, for the purposes of excluding it in the Defendant's calculations of potential revenues.  The Defendant further requested in the letter to Cosmos that the listed employees be offered sign-on bonuses by Cosmos.  On December 7, 1998, the Defendant, along with Keyes and Kevin Mullady, met with Mr. Murray to discuss the NHM transaction.  (10/28/09 Tr. p. 154) Neither the Defendant nor Mullady was offered employment with NHM at that meeting. (10/28/09 Tr. p. 179)

On December 10, 1998, the Debtor's largest client, Nippon Express, terminated its relationship with the Debtor and did not retain Cosmos as its broker.  (10/28/09 Tr. p. 94)  Keyes admitted that Nippon Express's actions would be "tremendously influential" to many of the other Japanese clients, who would ultimately "look elsewhere" for their insurance needs as well. (8/4/09 Tr. p. 92)

By letter dated December 11, 1998, Keyes advised the shareholders and directors of the Debtor of his indictment and stated as follows:

As you are no doubt aware, recent criminal charges brought by the Manhattan District Attorney's office against the undersigned alleging that I caused Marine Risks, Inc. to engage in multiple schemes to defraud and to wrongfully take property belonging to customers and/or reinsurance clients of Marine Risks, Inc. has had a material adverse affect [sic] on the conduct of our ongoing  business operations.

**At this writing, we have over 50% of our clients' renewals coming up within the next thirty days and can safely say that most, if not all, of these renewals are in serious jeopardy due solely to the criminal indictment brought by the District Attorney's office**.

(Defendant's Ex W-2) (emphasis added).

In Keyes' letter to the shareholders and directors of the Debtor, Keyes also discussed the proposed transaction with NHM, and annexed a copy of the Letter of Intent.  Keyes also advised that a special meeting of shareholders and directors would be held on December 29, 1998, for the purposes of, *inter alia*, 1) approving the actions taken by the Debtor's board of directors on November 10, 1998 on behalf of the defense of officers of the Debtor, 2) approving the proposed sale of assets to NHM, 3) authorizing the termination of a shareholders agreement between the Debtor and Keyes, and the Debtor and the Defendant, and 4) approving a new slate of directors of the Debtor, which did not include the Defendant.  (Defendant's Ex. W-2)

The Defendant testified he arranged a meeting with Cosmos during the week of December 14, 1998 and received an offer of employment from Cosmos a few days later. (10/28/09 Tr. p. 126)  The Defendant accepted the offer from Cosmos on December 17 or 18, 1998.  (10/28/09 Tr. p. 141)  The Defendant testified that between December 6, 1998 and December 21, 1998, he contacted one employee of the Debtor, Kevin Mullady, to inquire whether he was interested in joining Cosmos.  (10/28/09 Tr. p. 127)  At the time, Mullady was an officer and shareholder of the Debtor as well as an employee.  According to Mullady, his sole

initial contact regarding a job opportunity at Cosmos was the Defendant.  (10/28/09 Tr. p. 197)

The Defendant continued to meet with clients on behalf of the Debtor.  The Defendant advised clients who asked that he was not going to work for NHM.  However, according to the Defendant he did not advise the clients that he was seeking employment with Cosmos. (10/28/09 Tr. p. 137, 139)  As previously stated, clients were free to leave the Debtor and move to another broker once their insurance contracts with the Debtor expired.  (8/5/09 Tr. p. 118-19) The following clients of the Debtor did not renew their insurance contracts for the year commencing January 1, 1999 and instead transferred their accounts to Cosmos prior to January 1, 1999: Yamato Transport USA, Inc., China Products, Evergreen America Corporation, Atlantic Container Lines, Fox, Inc., Kaline Air Services, Ferdinand Gutman & Co., Mathison Gas Products, Minami International Corp., Night Hawk Services, Webster Mechanical and Omni Development.  (10/28/09 Tr. p. 133 - 135, 8/4/09 Tr. p. 118 - 142, Plaintiff's Exs. 17, 87, 109, 110, 131)

On December 21, 1998, the Defendant resigned as an employee of the Debtor, effective immediately.  The morning the Defendant delivered his letter of resignation to Keyes, the Defendant joined Cosmos as a Vice President.  Kevin Mullady resigned from the Debtor on December 21, 1998.  Robert Ludemann submitted his letter of resignation to Keyes on December 28, 1998, which was effective as of December 31, 1998.  (Plaintiff's Ex. 75)  Ludemann went to work for Cosmos as its West Coast manager.  (8/4/09 Tr. p. 112)  Tamoko Ono resigned from the Debtor effective December 28, 1998, and she joined Cosmos thereafter.  (8/4/09 Tr. p. 108). However, Ms. Ono had received a letter from the Debtor advising her that she would be terminated effective December 31, 1998.  (8/4/09 Tr. p. 158)  Tersa Moya also resigned from the

Debtor effective December 25, 1998, and she joined Cosmos shortly after her resignation from the Debtor. (10/28/09 Tr. p. 127, Plaintiff's Ex. 70) Jim Murphy resigned from the Debtor, and joined another insurance broker. Some time in 2001, Murphy then joined Cosmos.

On December 21, 1998, NHM advised the Debtor that it was no longer interested in pursuing the proposed transaction set forth in the Letter of Intent. (8/4/09 Tr. p. 66) By letter dated December 30, 1998, the Debtor requested the parent company of Cosmos to consider compensating the shareholders of the Debtor for the accounts and employees of the Debtor which had transferred to Cosmos. (Plaintiff's Ex. 88) As in the NHM transaction, the shareholders would be paid a stream of income over five years and the Debtor would receive no monetary benefit from the transaction. Cosmos rejected the proposal and rejected any assertion that they owed any duty to the Debtor. (Plaintiff's Ex. 89)

As of January 1999, the Debtor employed only approximately eight to ten employees. (8/4/09 Tr. p. 155) The record does not contain any direct evidence regarding which clients remained with the Debtor, or whether the Debtor's profit margin decreased after January 1, 1999. According to the testimony of Mullady, the Debtor's former Vice President, if the NHM transaction had been consummated, the Debtor would not have survived and would have been dissolved thereafter. (10/28/09 Tr. p. 188-89, 197)

On March 7, 2000, Keyes was convicted of fraud and grand larceny by embezzlement arising out of a scheme under which he caused the Debtor to overcharge clients for premiums and to divert premiums which should have been refunded to the Debtor's customers. Keyes' conviction was affirmed on October 17, 2002. *People v. Keyes,* 298 A.D.2d 234, 748 N.Y.S.2d 557 (N.Y. App. Div 2002).

According to the IRS transcripts of the Debtor's tax returns, the Debtor's gross revenues for 1997 were $2,493,067 (Plaintiff's Ex. 124), and the Debtor's gross revenues for 1998 were $2,229,016. (Plaintiff's Ex. 124)  The IRS transcripts for the Debtor's tax returns for 1999 reflect sharply lower gross revenues in the amount of $538,934.   (Plaintiff's Ex. 122) According to the Debtor's tax returns for the years 2000 and 2001, the Debtor's gross income decreased from $219,125, to $144,820, respectively. (Plaintiff's Ex. 125)  At least 30% and up to 40% of the decrease in revenues from 1998 to 1999 was caused by the departure of Nippon Express, which did not become a client of Cosmos.  The record contains no evidence quantifying the amount of revenue generated by the  clients of the Debtor which agreed to transfer their broker of record designation to Cosmos in late 1998 or 1999, or quantifying the Debtor's expected profit margin from these revenues.  The Debtor's consolidated financial report for the years ended December 31, 1998 and December 31, 1997, include a reference to Keyes' indictment and a statement by the accounting firm preparing the financial report that his indictment had a "material affect [sic] on the continued and ongoing business [of the Debtor]." (Plaintiff's Ex. 124)

The State of New York revoked both the Debtor's license and Keyes' license to engage in insurance business by a Final Determination and Order dated March 5, 2001 ("License Revocation Order").  The revocation was effective as of May 21, 2001.  The Debtor's license was revoked at the same time, because its license depended upon the existence of Keyes' license. According to Keyes, he doubted that the State Insurance Department would have approved any request by Keyes to substitute another broker in place of Keyes.  (8/4/09 Tr. p. 162)  At that point the Debtor was out of business.  (10/28/09 Tr. p. 194)

*Discussion*

**A.  Amendment of Complaint to Conform to Facts at Trial**

The Trustee has moved pursuant to Rule 15(b) of the Federal Rules of Civil Procedure to amend and conform the pleadings to the evidence presented at trial, alleging that the parties expressly and implicitly consented to try certain issues not included in the original complaint.  Although not well articulated,[2] it appears that the Trustee seeks to amend the complaint to include the following:  First claim for relief: (1) in addition to soliciting clients of the Debtor, the Defendant solicited key employees of the Debtor for his own benefit; and (2) the Defendant's breached his fiduciary duty as an officer and director of the Debtor by soliciting clients and key employees of the Debtor for the benefit of another company (Cosmos).  Second claim for relief: the Defendant breached his fiduciary duties as an officer and director of the Debtor by usurping the Debtor's right to enter into a transaction with Cosmos for his own benefit.  The Trustee also seeks to include in both counts the Defendant's actions after December 21, 1998, the date the Defendant submitted his letter of resignation to the Debtor, as evidence of breach of his fiduciary duty to the Debtor.

If the amendments to the complaint are permitted, the complaint will be enlarged to include allegations that the Defendant misappropriated the Debtor's  opportunity to enter into a transaction with Cosmos, for his own benefit and that the Defendant solicited clients and key employees the Debtor for his own benefit during and after his employment by the Debtor.  As a

---

[2]The Trustee states in his post-trial brief that "[t]o the extent that the original contentions contained in the Complaint with respect to the basis for liability of the Defendant [under each claim] have been expanded or altered by the evidence received at trial, . . . the Court [should] deem the Complaint amended to incorporate such facts and evidence."   The Trustee relies on the Court to determine the contours of these expansions or alterations.

result, the focus of the second cause of action would shift away from the Defendant's alleged

misappropriation of the proposed NHM transaction to the Defendant's alleged misappropriation

of a potential deal with Cosmos.[3]

Rule 15 of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the

Federal Rules of Bankruptcy Procedure, governs amended and supplemental pleadings in

adversary proceedings in bankruptcy. Fed. R. Bank. P. 7015. Rule 15 allows for amendment

during and after trial and provides, in          relevant part:

> When an issue not raised by the pleadings is tried by the parties' express or
> implied consent, it must be treated in all respects as if raised in the pleadings. A
> party may move - at any time, even after judgment - to amend the pleadings to
> conform them to the evidence and to raise an unpleaded issue. But failure to
> amend does not affect the result of the trial of that issue.

Fed. R. Civ. P. 15(b)(2).

The rule instructs that a request to amend pleadings to conform to evidence raised at trial may be

made by motion and that a party may move "at any time, even after judgment." *Id.*

"Rule 15(b) is 'mandatory, not merely permissive,' and requires that 'issues that are tried,

though not raised in the pleadings, be treated as though they were raised in the pleadings.'" *In re*

*Cross Media Mktg. Corp.,* 367 B.R. 435, 451 (Bankr. S.D.N.Y. 2007) (quoting *Ostano*

---

[3] The Trustee should have carefully reviewed the proceedings which took place prior to having the matter reopened and transferred to the Bankruptcy Court to ascertain whether the Debtor's estate stood to gain from the Trustee's prosecution of the claims set forth in the SDNY Lawsuit. This step was especially important in this case, where the parties holding the largest claims in the case are the Defendant's counsel and the Trustee's counsel. If the Trustee is successful, then the Trustee's expenses in bringing this action will be reimbursed and the Defendant's counsel will receive a distribution on its claim. If the Trustee loses, then there will most likely be insufficient funds in the estate to pay the Trustee's expenses. The purpose of bringing this action seems to have been lost in the fog of litigation, but at this point, it is obvious that there is no body of creditors of the Debtors for whose benefit this action was prosecuted.

*Commerzanstalt v. Telewide Sys., Inc.,* 880 F.2d 642, 646 (2d Cir.1989) (other citations omitted).

Because Rule 15(b) mandates amendment of the pleadings to conform to the evidence presented at trial, the sole issue to decide is whether these issues were actually tried by express or implied consent. Once such consent is found, the issues raised by the amendment must be treated as if they had been raised in the pleadings. *In re Cross Media Mktg. Corp.,* 367 B.R. at 452 (citing *O'Brien v. Moriarity,* 489 F.2d 941, 943 (1st Cir. 1974). A court may find express consent between the parties in a stipulation or pretrial order which references the issues sought to be added, and may infer consent when the non-movant has failed to object to evidence introduced at trial. *Id.* (quoting *Casey v. Lewis,* 43 F.3d 1261, 1269 (9th Cir. 1994), *rev'd on other grounds,* 518 U.S. 343 (1996) (other citations omitted)). Where there is no express consent, the court must also determine whether the non-movant would be prejudiced by the opposing party's request for amendment. *New York State Elec. & Gas Corp. v. Sec'y of Labor,* 88 F.3d 98, 104 (2d Cir. 1996). The Second Circuit has reasoned that a proper finding of prejudice requires that the amendment result in a disadvantage to the non-movant in presenting its case. *Id.*

In the Joint Pretrial Memorandum, the Trustee set forth all of the new facts and issues raised by the amendments without any objection by the Defendant, except for the inclusion of the Defendant's conduct post-resignation. At trial, testimony and/or documentary evidence concerning an offer by Cosmos to purchase the Debtor's assets and the Defendant's actions in connection with the offer by Cosmos was introduced without objection by the Defendant. Except for objecting to the entry of evidence regarding the Defendant's conduct after December

21, 1998, the Defendant never objected that the claims sought to be added were not included in the original complaint.  Therefore, the Defendant consented, both explicitly and implicitly, to try the issues related to the offer by Cosmos.

The Defendants are not prejudiced by these amendments because the facts  surrounding these new claims are substantially similar to the original claim -  that the Defendant breached his fiduciary duties as an officer and director of the Debtor by soliciting and taking the Debtor's clients with him to Cosmos for his personal benefit.  Therefore, the Court, as it must, grants the Trustee's motion to amend the pleadings to include in the first claim that employees of the Debtor were taken as well, and to include in the second claim that the Defendant usurped the Debtor's business opportunity presented by the Cosmos offer for his own benefit.  The portion of the Trustee's motion seeking to amend the complaint to include the Defendant's conduct after December 21, 1998 is denied.

### B.  Standard for Granting Directed Verdict

Federal Rule of Civil Procedure 52(c), made applicable pursuant to Bankruptcy Rule 7052, provides, in pertinent part:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c); Fed. R. Bank. P. 7052.

A judgment pursuant to Rule 52(c) "operates as a decision on the merits in favor of the moving party . . ." and "should be granted where plaintiff fails to make out a prima facie case, or despite the prima facie case, the court determines that the preponderance of

the evidence goes against the plaintiff's claim." *Matis v. United States*, 236 B.R. 562, 569

(E.D.N.Y. 1999) (citing *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375 (Bankr.

S.D.N.Y. 1998); *Stokes v. Perry*, No. 94 Civ. 0573, 1997 WL 782131, at *9 (S.D.N.Y. Dec. 19,

1997)).

A judgment granted pursuant to Rule 52(c) operates as a decision on the merits.  *See,*

*e.g., Matis v. United States,* 236 B.R. at 569 (citing *In re Regency Holdings (Cayman), Inc.*, 216

B.R. at 375).  Judgment should be granted in favor of the moving party if (1) the nonmoving

party fails to make out a *prima facie* case, or (2) despite the existence of a *prima facie* case, the

court determines by a preponderance of the evidence that judgment should be entered against the

plaintiff.  *Matis v. United States,* 236 B.R. at 562 (citing *Stokes v. Perry,*1997 WL 782131 at *9).

The rule "authorizes the court to enter judgment at any time that it can appropriately make a

dispositive finding of fact on the evidence."  Fed. R. Civ. P.  52 Advisory Committee note.  The

judge "must weigh and evaluate the evidence in the same manner as if he were making findings

of fact at the conclusion of the entire case," as provided for in Rule 52(a).  *Benton v. Blair*, 228

F.2d 55, 58 (5th Cir. 1955).

Unlike a motion for summary judgment or directed verdict, the court is not

required under Fed. R. Civ. P. 52(c) to "draw any special inferences in the nonmovant's favor, or

consider the evidence in the light most favorable to the nonmoving party."  *Matis v. United*

*States*, 236 B.R. at 569 (citing *In re Regency Holdings (Cayman), Inc.,* 216 B.R. at 371); 9A

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2573.1 (2d ed.

1995))

In general, "[i]t is doubtful if federal judges would enter judgment on the merits against a

plaintiff at the conclusion of its case if the evidence making out a prima facie case is

unimpeached.  It is only when the evidence has been impeached that there is any real occasion

for the judge to weigh the evidence before the moving party presents its case." 9C Charles Alan

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2573.1 (3d ed. 2008).  *See also*

*LaMarca v. United States,* 31 F. Supp. 2d 110, 123 (E.D.N.Y. 1998) (stating "[u]sually, Rule

52(c) motions are made by the defendant at the close of plaintiff's case and are granted when

plaintiff has failed to carry its burden of establishing a prima facie case").

### C.  Causes of Action

Based on the record at trial, it is clear that the three Directors of the Debtor had decided

after Keyes' indictment that the Debtor could no longer operate with Keyes at the helm.  At that

point, Keyes and Marcigliano pursued a course of conduct which would have caused the transfer

of all of the Debtor's assets to NHM for no consideration to the Debtor, and would have

benefitted the shareholders of the Debtor.  The Defendant pursued a course of conduct which

resulted in keeping him employed and servicing the Debtor's clients.  Under either scenario, the

Debtor never stood to benefit.  This was in fact an internecine struggle between the shareholders

of a solvent corporation.  Shifting the focus of the complaint from the aborted NHM transaction

to an alleged diversion of a corporate opportunity between the Debtor and Cosmos does not alter

the fact that the Debtor was never the intended beneficiary of either transaction.  The Trustee's

arguments in the first cause of action and one prong of the second cause of action  are based on

the false premise that but for the Defendant's actions, the Debtor would have retained most of its

clients and would have continued to thrive into 1999 and beyond.    In order to accept this, one

would have to ignore that the Debtor had already determined to transfer its assets, leaving the

Debtor with little to no clients and no employees.  This is disingenuous at best and completely unsupported by the record.  With this in mind, the Court will examine each cause of action.

### 1. *First claim*

In the Trustee's first claim as amended, the Trustee alleges that Pilipiak breached his fiduciary duties as director and officer of the Debtor by soliciting and diverting the Debtor's clients and key employees away from the Debtor to Cosmos for his own benefit, while he was employed by the Debtor.   In order to establish a *prima facie* case against the Defendant on the first claim the Trustee must prove  1) the Defendant owed a fiduciary duty to the Debtor, 2) the Defendant breached this duty, and 3) the Defendant's breach of his fiduciary duties caused damages to the Debtor which are ascertainable and are proximately caused by the breach.   *See Am. Fed. Grp., Ltd. v. Rothenberg (American Federal Group 1)*, 136 F.3d 897, 905-08 (2d Cir. 1998) (other citations omitted), *RSL Commc'ns PLC v. Bildirici,* 649 F. Supp. 2d 184, 198-99, 208-10 (S.D.N.Y. 2009) (other citations omitted).  Generally, the laws of the state of incorporation govern issues concerning the conduct of the directors and officers of a corporation. *Burg v. Horn*, 380 F.2d 897, 899 (2d Cir. 1967) (citing *Hausman v. Buckley*, 299 F.2d 696, 702-05 (2d Cir.), *cert. denied*, 269 U.S. 885 (1962)).  The Debtor was incorporated in New York, therefore New York law applies.  The Court is charged with analyzing each element of the Trustee's claims to determine whether Trustee established a *prima facie* case.

### a. *Fiduciary Duty*

It is undisputed that the Defendant, as an officer and director of the Debtor, owed a fiduciary duty to the Debtor.  A director owes the corporation a duty of care and a duty of loyalty. *Norlin Corp. v. Rooney, Pace, Inc.*,744 F.2d 255, 264 (2d Cir. 1984).  The duty of care,

as set forth in Section 717(a) of New York Business Corporation Law, requires that a director perform his duties "in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. Law § 717(a). The duty of loyalty "derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Norlin Corp. v. Rooney, Pace, Inc.*,744 F.2d at 264 (citing *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)). Under New York law, the duty of loyalty requires a director to subordinate his own personal interests to the interests of the corporation. *Patrick v. Allen,* 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005). "The scope of this fundamental duty is . . . determined by the circumstances of each case, and does not run to every act having every semblance of employee self-interest." *American Federal Group 1*, at 906.

The Second Circuit in *Burg v. Horn* cites examples illustrative of what a corporate directors may not do: a director may not draw away existing customers of the corporation, *Burg v. Horn*, 380 F.2d at 899 (citing as example *Sialkot Importing Corp. v. Berlin*, 295 N.Y. 482, 68 N.E.2d 501 (N.Y. 1946)), nor "purchase property which the corporation needs or has resolved to acquire, . . . or which it is contemplating acquiring," *Id.* (citing *Blake v. Buffalo Creek R.R.*, 56 N.Y. 485 (N.Y. 1874); *New York Trust Co. v. American Realty Co.*, 244 N.Y. 209, 219, 155 N.E. 102, 105 (N.Y. 1926)), nor "take advantage of an offer made to the corporation, . . . or of knowledge which came to him as a director." *Id.* at 900 (citing as examples *Kelly v. 74 & 76 West Tremont Ave. Corp.*, 4 Misc.2d 533, 151 N.Y.S.2d 900 (N.Y. Sup.Ct. 1956), modified on other grounds sub nom. *Procario v. 74 & 76 West Tremont Ave. Corp.*, 3 A.D.2d 821, 160 N.Y.S.2d 932 (N.Y. App. Div. 1957), aff'd mem., 3 N.Y.2d 973, 169 N.Y.S.2d 39, 146 N.E.2d 795 (N.Y. 1957); *In re McCrory Stores Corp.*, 12 F. Supp. 267 (S.D.N.Y.1935)).

Although the Defendant's fiduciary duty to the Debtor extended beyond the date the Defendant ceased working for the Debtor because the Defendant remained an officer and a Director after such date, the Trustee limited his allegations in the complaint to the Defendant's conduct while he was employed by the Debtor.  Therefore, the Court can only consider the Defendants actions during the time period he was employed by the Debtor.  The Trustee asserts that the Defendant was employed by the Debtor until he submitted his letter of resignation effective December 21, 1998.  The Defendant asserts that he was "effectively" terminated on December 2, 1998, based on the statements made by Keyes at the meeting regarding the contemplated transfer of clients and employees of the Debtor to NHM.  Regardless of the Defendant's belief that he would no longer be employed by the Debtor as of December 31, 1998, there is no evidence that the Defendant was ever terminated by the Debtor.  The record is clear that the Defendant remained employed by the Debtor until December 21, 1998, when he tendered his resignation.  After December 2, 1998, the Defendant continued to draw a salary from the Debtor and continued to act as an employer of the Debtor by performing work for the Debtor and meeting with clients of the Debtor.  The Defendant's belief that he would no longer have a position with the Debtor after December 31, 1998, does not affect the Defendant's employment status with the Debtor through December 21, 1998, the date he actually resigned as an employee, officer and director of the Debtor

### b.  Breach of Fiduciary Duty

Once the Defendant is determined to owe the Debtor a fiduciary duty to act in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances, any breach of this fiduciary duty may be actionable if the remaining

elements of causation and damages are established.  The Trustee must establish that the

Defendant's actions, while he was employed by the Debtor, constituted a breach of his fiduciary

duty.  While the Defendant is not accused of soliciting clients to terminate their ongoing

contracts with the Debtor, the Defendant is charged with soliciting the Debtor's current clients to

enter into new contracts with a third party after their contracts with the Debtor expired.

According to the Trustee, the Defendant's conduct constitutes usurpation of a corporate

opportunity of the Debtor.  The corporate opportunity doctrine prohibits "a corporate employee

from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity

belonging to the corporation." *American Federal Group 1*, at 906 (citing *Alexander &*

*Alexander, Inc. v. Fritzen*, 147 A.D.2d 241, 542 N.Y.S.2d 530, 533 (N.Y. App. Div. 1989).

It is clear that any solicitation by the Defendant of the Debtor's clients during the time

that the Defendant was employed by the Debtor, would constitute a breach of the Defendant's

fiduciary duty to the Debtor.  *Am. Fed. Grp., Ltd. v. Rothenberg (American Federal Group 2)*,

No. 91Civ.7860, 1998 WL 273034, at *1 (S.D.N.Y. May 28, 1998).  This is true whether the

Defendant solicited clients of the Debtor to obtain their current business, or whether the

Defendant solicited clients of the Debtor to obtain their business after their contracts with the

Debtor expired.  *See id*. (finding that former officer, shareholder and employee of plaintiff

company breached his fiduciary duty by soliciting clients to transfer their current insurance

broker accounts and by soliciting clients to transfer their insurance accounts upon expiration of

the current accounts with the plaintiff) (citing *American Federal Group 1*, at 906; *Keehan v.*

*Keehan,* No. 97 Civ. 6580, 2000 WL 502852, at *5 (S.D.N.Y. April 26, 2000)).  The Defendant,

as an officer and director, breached his duty to the Debtor if he "'had been intrusted with the

duty of re-engaging [an employee] for [the Debtor's benefit] and had then engaged him for his own.'"  *Keehan v. Keehan,* 2000 WL 502854 at *5 (citing *New York Auto. Co. v. Franklin,* 49 Misc. 8, 97 N.Y.S. 781, 785 (N.Y. 1905)).

The Defendant cites to *American Federal Group 2* for the proposition that an insurance broker such as the Debtor could not have a continuing "tangible expectancy" in retaining its ongoing business if the contracts were up for renewal.[4]  However, the court in *American Federal Group 2* was addressing whether an officer and shareholder breached his duty to a corporation when he solicited clients of that corporation for prospective business after he no longer had a relationship with that corporation.  The court correctly distinguished between competing with a former employer in the highly competitive insurance broker business, which is permitted, and soliciting business in which a former employer had an existing "tangible expectancy," which is not.  *American Federal Group 2*, at *15.

The Court must now determine whether the Trustee made a *prima facie* case that the Defendant solicited clients of the Debtor to enter into new contracts with Cosmos.  The Trustee relies on the following to make his case: (1) a series of e-mails to or from employees of ACL, one of the clients of the Debtor which signed with Cosmos shortly after the Defendant resigned from the Debtor (Plaintiff's Ex. 87), (2) Plaintiff's Ex. 109, which was not admitted into evidence, (3) Plaintiff's Ex. 61, which was also not admitted into evidence, and (4) the Trustee's conclusion that because the Defendant solicited ACL and Evergreen prior to his resignation, the

---

[4]A business opportunity "in which a corporation has a 'tangible expectancy' which means 'something much less tenable than ownership, but, on the other hand, more certain than a desire or hope.'" *American Federal Group 1*, at 906 (citing *Alexander & Alexander, Inc. v. Fritzen*, 542 N.Y.S.2d at 534).

Defendant must have been soliciting other customers of the Debtor as well.

The evidence admitted at trial, coupled with the letter from the Defendant to Cosmos dated December 6, 1998 that he would bring with him a "block" of the Debtor's clients, and the timing of the broker of record letters supports a finding that it was possible that the Defendant solicited the Debtor's clients to enter into new contracts for his own benefit and for the benefit of Cosmos.  However, all of the evidence is circumstantial and is not sufficiently probative to establish that the Defendant actually solicited the clients to leave the Debtor for Cosmos.

The only direct evidence regarding the Defendant's contact with the clients during this time period are e-mails reflecting that the Defendant furnished renewal contracts to ACL on behalf of the Debtor, and the Defendant advised ACL that he would either be starting his own business or joining another insurance agency.  (Plaintiff's Ex. 87)  This evidence does not support a finding that the Defendant sought to retain ACL's business at his new employment, wherever that may be.  Advising a client that you are leaving a company does not constitute a breach of a director's fiduciary duty.  *American Federal Group 2*, at *8.  The only other representations contained in the e-mail from ACL are the reference to Keyes "selling Walter down the river" and the reference that ACL's policies currently with the Debtor are under the Defendant's control as the broker of record.  While the Defendant was not the broker of record, there is no indication that it was the Defendant who gave ACL this false impression in order to convince ACL to follow the Defendant to his new employer.  The ACL e-mail actually supports a finding that ACL had already decided not to renew its contract with the Debtor, because ACL discusses scheduling an interview with another insurance broker to take the Debtor's place.  The Trustee did not call any former clients of the Debtor to testify regarding representations the

Defendant may have made.

In sum, the evidence the Trustee relies on to support a finding that the Defendant solicited clients of the Debtor to leave the Debtor upon the expiration of their current contracts and join the Defendant is based largely on the clients' failure to renew with the Debtor.  Unlike the *American Federal Group 2,* where the court determined after a lengthy trial with testimony from over twelve former clients of the plaintiff corporation that the defendant had solicited some of the clients to follow him to his new firm, there is no testimony by any former clients of the Debtor that the Defendant solicited their business and sought their assurance that they would follow the Defendant.  The only testimony in the record supports a finding that the Defendant presented renewal contracts to the Debtor's clients, and he advised the Debtor's clients that he was leaving the Debtor.

### c.  Causation

Even if the Court were to find that the Defendant breached his fiduciary duty to the Debtor, in a claim based on breach of fiduciary duty, where the remedy sought is damages to compensate for losses incurred by the claimant, the claimant must show causation as a necessary element of its claim.  *American Federal Group 1* at 907, n.7; *RSL Commc'ns PLC*, 649 F. Supp. 2d at 208 (other citations omitted).  If the remedy sought is restitution against the party breaching his or her fiduciary duty, then it is sufficient to show that the breach was a "substantial factor" in contributing to the injury.  *American Federal Group 1* at 907 n.7.  Because the Trustee seeks damages based on losses suffered by the Debtor, the more stringent test for causation must be satisfied.  As set forth in *RSL Commc'ns PLC* the usual causation rule under this test requires "but for" and proximate causation:

These are not novel concepts. "[C]ausation has been 'a well-recognized and essential element of the [tort] plaintiff's case in chief' since at least the early 17th century, and probably much, much before." *Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 426 (2d Cir. 2004) (Calabresi, J., concurring) (quoting *Zuchowicz v. United States*, 140 F.3d 381, 384 n.2 (2d Cir. 1998)). Nor, contrary to Plaintiff's argument, is the application of these causation principles limited to instances in which the plaintiff "is . . . seeking damages to compensate it for lost profits or lost earnings." . . . The only distinction drawn in the Second Circuit authority on this issue focuses on the difference between restitutionary remedies and compensatory damages. *See American Federal Group 1*, at 907 n.7. Lost profits, as relevant in [*American Federal Group 1*], are simply a subset of compensatory damages. *See* 1 Dan B. Dobbs, *Handbook on the Law of Remedies* § 3.3(4), at 302. . . . [Because the plaintiff seeks restitution] Plaintiff must establish both "but for" and proximate causation.

"But for" causation, which the Court refers to as "factual causation," presents a "threshold question" of whether the alleged breach of fiduciary duty was a "cause in fact" of the loss complained of by the plaintiff. *Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460,484 (S.D.N.Y. 2005); *see also Petitt v. Celebrity Cruises, Inc.,* 153 F. Supp. 2d 240, 252 n.10 (S.D.N.Y. 2001); *Barnes v. Andrews*, 298 F. 614, 616 (S.D.N.Y. 1924) (Hand, J.) ("The plaintiff must accept the burden of showing that the performance of the defendant's duties would have avoided loss, and what loss it would have avoided.").

*RSL Commc'ns PLC*, 649 F. Supp. 2d at 208.

In this case, the Trustee must establish that the Defendant's solicitation of clients and employees was a cause in fact of the losses suffered by the Debtor. To hold otherwise would permit the Defendant to be liable for an injury the Defendant did not actually cause. *See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 684 F. Supp. 27, 35 (S.D.N.Y. 1988) (stating "fault unrelated by causal connection to injury is without legal significance"). Where there are multiple possible causes of a single harm, which the Trustee readily concedes is the case, the Court my still find cause based on one single factor where each of the potential causes are sufficient, standing alone, to have caused the injuries sustained by the claimant. *RSL Commc'ns PLC*, 649 F. Supp. 2d at 209 (citing *Point Prods. A.G. v. Sony Music Entm't, Inc.,* 215 F. Supp. 2d 336, 342 (S.D.N.Y. 2002)).

The record does not support a finding that if the Defendant did solicit the Debtor's clients, this solicitation in fact caused the clients not to renew their contracts with the Debtor.  At the time the Defendant was advising clients of the Debtor that he was departing from the Debtor, the clients were also aware that 1) Keyes had been indicted for committing fraud with respect to funds belonging to clients of the Debtor, and 2) the Debtor was negotiating a transfer of its clients and employees to a third party, NHM.  These two factors, standing alone, had a much greater negative effect on the Debtor's chances of renewing the contracts than the Defendant's actions alone.  Keyes admitted that his indictment placed the Debtor's business in serious jeopardy.  Keyes also admitted that the departure of Nippon Express, its largest client, was due to Keyes' indictment, and other Japanese clients would be influenced by the departure of Nippon Express.  The belief that the clients would not renew their contracts with the Debtor due to Keyes' indictment was echoed in the Debtor's own financial statements for the relevant time period, and by Keyes' actions post-indictment.  Keyes testified that he sought a suitor to run the Debtor's business in his place so the business would not be tainted by his indictment because he knew that if he stayed on, the Debtor would lose the bulk of its clients.  At this point, all of the Debtor's clients were aware that the Debtor was attempting to transfer most of its business to NHM and therefore, the Debtor would not be in a position to service these clients after January 1, 1999 in any event.  This fact seemed to have played a significant role in ACL's decision to decline to renew its contract with the Debtor in December 1998.  (Plaintiff's Ex. 87).

The argument that Defendant's conduct caused the Debtor's losses is unsupported by the record.  The Trustee failed to call any witnesses to establish that the clients left the Debtor because of the Defendant's solicitation, unlike the plaintiff in *American Federal Group 2*.

There, the record reflected that clients of the plaintiff left the plaintiff because of the defendant's solicitation, coupled with the fact that the defendant alone had access to a certain type of insurance.  We have no such record in this case.  The court in *American Federal Group 2* had the benefit of testimony from these clients to review when determining the relative weight the differing factors had in the client's decisions to leave the plaintiff.  In our case, the record indicates that more likely cause of the clients' failure to renew their contracts with the Debtor was the indictment of Keyes.

### d.  Damages

Even if the Trustee had established that the Defendant solicited the Debtor's clients, and his conduct was the proximate cause of injury to the Debtor, the Trustee has failed to prove with any degree of certainty what if any damages are the result of the Defendants actions.   In the original complaint, the plaintiff (the Debtor) asserted that the Defendant's conduct caused damages in an amount of not less than $1 million.  In its post-trial memorandum, the Trustee argues that the Defendant's conduct caused the Debtor to suffer significant harm which can be measured by the reduction in revenues from the years prior to 1998 to the levels during the years 1999 and thereafter.  The only evidence introduced  by the Trustee to support the claim for damages as set forth in the complaint are copies of tax returns and financial reports of the Debtor for 1997, 1998, and 1999.  Although the complaint calculated damages based on the value of the NHM proposal to the shareholders, at trial, the Trustee appears to have abandoned that theory and is now seeking to calculate the damages based on lost earnings suffered by the Debtor for the time after the Defendant resigned from the Debtor and after many of the Debtors' clients failed to renew their policies with the Debtor.

In order to recover damages for lost earnings based on breach of fiduciary duty, the plaintiff must "prove with certainty that any losses sustained were caused by the breaches alleged." *American Federal Group 1*, at 911 (citing *Stoekel v. Block,* 170 A.D.2d 417, 417-18, 566 N.Y.S.2d 625, 626 (N.Y. App. Div. 1991)).  Loss of profits can be determined by evidence of earnings history, or by examining the commission revenue lost when the Debtor's clients transferred their business  to Cosmos.

The Trustee has failed to meet his burden to  quantify the damages allegedly caused by the Defendant's conduct.  The record is barren regarding the extent to which the Debtor's loss in income for 1999 and thereafter can be specifically attributed to the migration  of the Debtors clients to Cosmos.  The Trustee has also introduced into the record  no evidence  regarding the Debtor's  profit margin  on these contracts.  *See American Federal Group 2* at *23 (earnings margin of 60% was applied to quantify value of lost commissions caused by defendants improper solicitation and subsequent departure of clients).  The Trustee also failed to introduce any evidence regarding whether the loss of clients was ameliorated in any way by the corresponding loss in overhead due to the departure of a substantial number of employees. Finally, the Trustee failed to recognize that in calculating any claim for damages the Debtor may have had with regard to the contract renewals such calculation could not extend beyond one year. The Debtor had no "tangible expectancy" in these contracts for subsequent years once the clients did not renew with the Debtor.  *See Abbott Redmont Thinlite Corp. v. Redmont* (*Abbott*)*,* 475 F.2d 85, 88 (2d Cir. 1973) (citing *S.W. Scott & Co. v. Scott,* 186 App. Div. 518, 174 N.Y.S. 583 (N.Y. App. Div. 1919)).  Even if the Debtor did suffer ascertainable damages based on the clients' failure to renew the contracts, the Debtor would not have a continuing right for

compensation for the years thereafter.  *American Federal Group 2 at *18*.  Because the record is barren of any quantifiable basis to fix damages with any degree of certainty, the Trustee has failed to satisfy his burden of proof.

### 2.  Second Claim

In order to establish a *prima facie* case on the second claim, the Trustee must prove that 1) Defendant, as an officer and director, owed a fiduciary duty to the Debtor, the 2) Defendant breached that duty by appropriating the business opportunity presented by the NHM deal for his own benefit, by diverting the clients and employees of Debtor to Cosmos, or the Defendant breached that duty by assuming the business opportunity presented by Cosmos for his own benefit, and 4) damages flowing from the breach.  The Court has already concluded that Trustee has introduced sufficient evidence for the Court to find that the Defendant owed a fiduciary duty to the Debtor during the time period in question.

### a.  Breach of Fiduciary Duty

The Trustee has failed to introduce evidence that the NHM proposal and  the opportunity presented by Cosmos were in fact  corporate opportunities belonging to the Debtor.  According to the Trustee, the NHM venture and the Cosmos proposal  regarding the transfer of a block of clients and employees of the Debtor created a valuable potential interest that rightfully belonged to the Debtor.  The alleged property interest is an interest in the payment stream from the sale of the Debtor's assets.  However, these income streams were only to go to the shareholders of the Debtor and not the debtor itself.  Neither the NHM nor the Cosmos venture satisfies the "tangible expectancy" test set forth above, and therefore neither venture qualifies as a corporate opportunity.  Because neither venture constituted a corporate opportunity, the Plaintiff has failed

to establish a *prima facie* case that the Defendant breached his fiduciary duties by usurping a corporate opportunity of the Debtor.

### (1) The NHM and Cosmos Ventures Did Not Constitute Corporate Opportunities

Under relevant case law, the property interest attributable to the NHM proposal did not rise to the level of a "tangible expectancy" as a matter of law. In *Abbott* the Court of Appeals held that pre-contractual relationships between the plaintiff corporation and certain architects for the supply and installation of glass blocks and roof lights, constituted a tangible expectancy of the plaintiff corporation. *Abbott*, at 88-89. The contracts in question in *Abbott* would almost certainly have been finalized with the plaintiff corporation if the defendant director had not taken the opportunity for himself. *Id*. The Court of Appeals in *Abbott* reasoned that "but for" the defendant's entry into direct competition with the corporation, the business would have been the corporation's. *Id*. Furthermore, once the corporation's specifications were written into the architectural plans for the five contracts, "it was almost a certainty" that the contract with the plaintiff corporation would be entered. *Id.* at 88. Unlike *Abbott*, in the instant case, the NHM pre-contract relationship was far less certain. The Letter of Intent stated that the transaction was subject to NHM's due diligence, and the closing was contingent upon successful completion of this due diligence.

In addition, the NHM transaction was not in fact a corporate opportunity - rather it was a scheme which allowed the shareholders to transfer the assets of the Debtor for their personal benefit. *Burg v. Horn* provides a list of proscriptions, one of which condemns a fiduciary's "purchase of property which the *corporation* needs or has resolved to acquire . . . or which it is

contemplating acquiring." *See Burg v. Horn*, 380 F.2d at 899 (emphasis added). The NHM deal

did not represent a property interest that the Debtor was seeking to acquire. In fact, it was the

direct opposite. If the NHM deal had been consummated, the Debtor would have been divested

of its clients and employees for no consideration. The NHM deal provided that only

shareholders would benefit and the Debtor would receive nothing. Shareholders and the

corporate entity are not one and the same, *see Manley v. Ambase Corp.*, 121 F. Supp. 2d 758,

769-70 (S.D.N.Y. 2000) (citing cases), and there is no evidence in the record that the Debtor and

the shareholders are one and the same. *See OM Intercontinental v. Geminex Intern., Inc.*, No. 03

Civ. 6471(RCC), 2006 WL 2707327, at *7 (S.D.N.Y. Sept. 18, 2006) (stating that New York

courts are reluctant to disregard the corporate form, unless the "'form has been used to achieve

fraud or when the corporation has been so dominated by an individual or another corporation . . .

and its separate identity so disregarded, that it primarily transacted the dominator's business

rather than its own and can be called the other's alter ego . . .'") (citing cases). Therefore, the

venture with NHM could not be deemed an asset *of the corporation* and fails to constitute a

corporate opportunity of the Debtor.

The Cosmos venture also did not rise to the level of a corporate opportunity. The

Cosmos venture consisted of a phone call on November 13, 1998 from Mr. Nonomura, an officer

of Cosmos, to the Defendant inquiring whether Keyes was considering selling the Debtor. In

that conversation the Defendant responded that any inquiries should be directed to Keyes. On

December 2, 1998 the Defendant advised Keyes about the phone call from Mr. Nonomura.

Keyes responded that he was not interested in any transaction with Cosmos, and Mr.

Marcigliano, who also learned of this opportunity on that date, agreed that the venture was not a

"reasonable possibility."  The Debtor had no "tangible expectancy" of any deal to sell assets to Cosmos.

In addition, the Trustee has not demonstrated that the agreement between the Defendant and Cosmos constituted the diversion of a corporate opportunity of the Debtor.  Because the Debtor had already determined to transfer its clients to a third party for no consideration the Trustee cannot argue that these clients had real value to the Debtor and that the Debtor's future depended upon the continued retention of these clients.  A corporate opportunity cannot exist where the "opportunity" has no value to the corporation, and the Trustee cannot now complain that the Debtor lost out on realizing the value of the transfer of its clients.  Whether NHM, Cosmos, or some other third party could find value in the contracts is not before the Court.  The question is whether the property in question, in this case the contracts with the clients, represented tangible expectancies of the Debtor.  They clearly did not and the Trustee has failed to establish a *prima facie* cause of action set forth in the second count, as amended.

### (2)  *The Defendant Did Not Usurp Any Corporate Benefit Represented by Either the NHM Venture or the Cosmos Venture*

Even if the Trustee could establish that the NHM or Cosmos deal was a corporate opportunity, the Trustee has not established that the Defendant usurped the opportunity.  Usurpation requires that the Defendant take the opportunity for himself.  The fiduciary must "divert that expectancy to his own profit."  *Abbott*, at 88.  The Defendant did not divert the proceeds from the sale of assets to himself.  With respect to NHM, the Defendant did not "step into the shoes" of the Debtor, as occurred in the *Abbott* case.  With respect to the Cosmos transaction, there was never a corporate benefit for the Defendant to usurp.

### *3. Third Claim*

In the third cause of action, the Trustee alleges that the Defendant tortiously interfered with the NHM transaction.  In order to establish a *prima facie* case of tortious interference, the Trustee must prove the following:  "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's intentional procurement of a breach of contract by the third party; and (3) damages caused by the breach."  *Innovative Networks, Inc. v. Young*, 978 F.Supp. 167, 178 (S.D.N.Y. 1997) (citing *Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 560-61 (S.D.N.Y. 1985).  *See also Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009).  If the plaintiff cannot prove there was a valid and enforceable contract, the claim must fail.  *Mayo, Lynch & Assocs. v. Fine*, 538 N.Y.S.2d 579, 579 (N.Y. App. Div. 1989) (citing *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445 (N.Y. 1980); *Taub v. Amana Imports*, 528 N.Y.S.2d 884 (N.Y. App. Div. 1988)).  In addition, if the plaintiff cannot prove that there would not have been a breach but for the activities of the defendant, the claim also fails. *Sharma v. Skaarup Ship Mgm't Corp.*, 916 F.2d 820, 828 (2d Cir. 1990).

New York law determines whether a valid contract exists between the parties, *Gorodensky v. Mitsubishi Pulp Inc.*, 92 F.Supp.2d 249, 254 (S.D.N.Y. 2000), and courts must be careful not to bind parties to contractual obligations that they never intended.  *Id.* (citing *Teachers Ins. & Anuity Ass'n v. Tribune Co.* 670 F.Supp. 491, 497 (S.D.N.Y. 1987).  There are two types of preliminary agreements.  *Id.*  The first type is a fully binding preliminary agreement, where the parties have agreed on all the points requiring negotiation (including whether to be bound) but agree to subsequently memorialize the agreement in a more formal document.  *Id.* (citing *Adjustire Sys., Inc. v. GAB Business Servs., Inc. (Adjustrite)*, 145 F.3d

543, 548 (2d Cir. 1998)).  This type of contract is binding as if it were a formalized agreement because the signing of a more elaborate document is just a formality.  *Id*. (citing *Teachers Ins. & Anuity Ass'n v. Tribune Co*., 670 F.Supp. at 498).  The second type of preliminary agreement is created when the parties "agree on certain major terms, but leave other terms open for further negotiation." *Id*. (citing *Adjustrite*, 145 F.3d at 548).  The parties have a mutual commitment to negotiate in good faith to reach a final agreement.  *Gorodensky*, 92 F. Supp.2d at 254 (citing *Teachers Ins. & Anuity Ass'n v. Tribune Co*., 670 F.Supp. at 498).  Thus, a party to this second type of agreement is not bound, and "has no right to demand performance of the transaction." *Id*. (citing *Adjustrite*, 145 F.3d at 548).

The test for determining whether the first type of preliminary agreement exists examines "(1) the language of the agreement; (2) the existence of open terms; (3) whether there has been partial performance; and (4) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Id*. at 254-55 (citing *Adjustrite*, 145 F.3d at 549).  The test for determining the presence of the second type of preliminary agreement requires an examination of these same four factors, along with a fifth factor, which is "the context of the negotiations resulting in the preliminary agreement." *Id*. at 255 (citing *Adjustrite*, 145 F.3d at 549 n.6).

The first factor, the language of the agreement itself, is recognized as the most important factor. *Id.* at 255 (citing *Arcadian Phosphates, Inc. v. Arcadian Corp.,*884 F.2d 69, 72 (2d Cir. 1989)).  The Letter of Intent contains language which clearly indicates that the parties did not intend the letter to be a binding agreement.  First, the subject of the letter is "Letter of Intent."  Second, while the first paragraph states that NHM "shall" acquire certain ongoing business of

the Debtor, the third paragraph gives NHM the "sole right" to determine in writing whether there is adequate "merit" to purchase these assets after conducting due diligence.  This indicates that NHM needed to take further steps before making a firm commitment to purchase any assets of the Debtor.  Third, the Debtor's signature includes the language "subject to shareholders approval."  Fourth, the Letter of Intent refers to "papers" including schedules of accounts to be provided at the closing of the transaction.  When viewed in total, the language is clear that neither party wished to be bound at the time of execution of the Letter of Intent.  *See id.* (finding that where neither party negotiated for language stating a clear commitment, neither party evidenced an intent to be bound by its terms).  Rather, the Letter of Intent represented an agreement by NHM to conduct due diligence to determine whether it wished to purchase any assets of the Debtor under the terms set forth.  This alone supports a finding that the Letter of Intent was not a binding agreement for the sale of the Debtor's assets to NHM.

The second factor, the existence of open terms, also demonstrates that the Letter of Intent was not a binding agreement.  The terms regarding the actual business to be sold is vague as it is described as the book of business classified as insurance brokerage, reinsurance brokerage and consulting services to the Debtor's clients, without naming any specific client.  There is a reference in the Letter of Intent to a schedule of the Debtor's accounts "to be attached to the papers at Closing" but again no clients are listed in the Letter of Intent.  The proposed employment of all key employees of the Debtor is equally unspecific, and does not identify who the key employees are, the proposed terms of employment, salaries or positions.  The Letter of Intent states that the Debtor's shareholders were to receive a fixed percentage of the commissions generated from the business of the former clients of the Debtor, this is the only

term which supports a finding that the terms of the Letter of Intent were specific.  So many terms of the transaction remained open and subject to due diligence, especially with respect to which clients were to be acquired and which employees were to receive offers from NHM, that the Court concludes that this factor supports the Defendant's contention.

The third factor, partial performance, requires that some part of the actual contract be performed, and that such performance provide a benefit to the other party.  *Id.* at 256 (citing *P.A. Bergner & Co. v. Martinez,* 823 F. Supp. 151, 157 (S.D.N.Y. 1993)).  In this case, the only part of the contract which was performed was preliminary due diligence by NHM.  Upon performing the due diligence NHM concluded that it no longer wished to pursue the transaction outlined in the Letter of Intent.  NHM had the specific right under the terms of the Letter of Intent to determine whether the proposed transaction had merit and to decline to pursue the transaction. (Plaintiff's Ex. 67)  This right was absolute and subject only to NHM's sole discretion. Certainly no transfer of clients took place and no payments were made to the Debtor's shareholders.

The remaining factors, the context of the negotiations between the parties and the requirement of a formal agreement, favor a finding that the Letter of Intent was not a binding agreement.  NHM still had to conduct due diligence before determining whether to purchase any assets of the Debtor, and the Letter of Intent contemplated entry into formal documents at closing.  Neither the specific accounts to be sold nor the employees to be offered positions were fixed in the Letter of Intent and NHM and the Debtor had conditions precedent to the closing which had yet to be satisfied.  As the Second Circuit held in *Teachers Ins. & Anuity Ass'n v. Tribune Co.,* 670 F. Supp. at 499, '[t]here is a strong presumption against finding a binding

obligation in an agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." The Trustee has failed to overcome this presumption, and the Court concludes that the Letter of Intent was not a binding agreement between the parties.

Even if the Letter of Intent did constitute such a binding agreement, there is insufficient evidence to support a finding that the Defendant's actions constituted tortious interference with the proposed NHM transaction. To make a *prima facie* case, the Trustee must show that there was a breach of the contract, and "'there would have not been a breach but for the activities of [the Defendant].'" *Sharma v. Skaarup Ship Mgm't Corp.*, 916 F.2d at 828 (other citations omitted). The record before the Court does not support a finding of breach of contract by NHM, which would be a prerequisite to a finding of tortious interference. NHM did not breach the Letter of Intent because the Letter of Intent gave NHM the right to determine that the value of the proposed transaction was insufficient, and to terminate the transaction. The Letter of Intent did obligate NHM to make an offer of employment to all key employees after conducting due diligence, which included interviewing the Debtor's staff. The term "key employee" is not defined in the Letter of Intent. However, it is not clear that NHM had completed its due diligence, had determined to continue negotiations, and had stopped only after getting the impression that the Defendant would not consider employment by NHM. It is not clear from the record that the Defendant's actions caused NHM to end its negotiations with the Debtor. It could have been just as likely that the departure of so many clients caused NHM to cease negotiations, and there is no evidence that but for the Defendant's actions, the majority or even a substantial number of clients would have renewed their insurance contracts with the Debtor. It is

also just as likely that Keyes' indictment precipitated the departure of the clients, not the Defendant's refusal to accept employment by NHM.  For these reasons, the Motion is granted as to the third cause of action.

***Conclusion***

1) The Trustee's motion to amend the complaint is granted except to the extent the Trustee seeks to include the Defendant's conduct after he resigned from the Debtor on December 21, 1998.

2) The Motion is granted as to the first, second and third causes of action. The Trustee has failed to establish a *prima facie* case as to any of these causes of action because essential elements of each claim have not been proven.

An order and judgment memorializing the Court's decision shall be entered forthwith.

Dated: Central Islip, New York
August 24, 2010                            By: ***/s/ Robert E. Grossman***
                                                Robert E. Grossman, U.S.B.J.